Celebrezze, Circuit Judge, dissented and filed opinion.

**Frank James STEVENS, Defendant-Appellant,**

v.

**UNITED STATES of America, Plaintiff-Appellee.**

No. 20488.

United States Court of Appeals, Sixth Circuit.

March 22, 1971.

when the indictment does not charge and the evidence does not establish that the firearm was in commerce or affected commerce? (2) If so, did Congress have the power to enact such a statute? We answer both questions in the affirmative and uphold the conviction of Frank James Stevens for violation of 18 U.S.C. App. § 1202(a) (1).

This statute, which was enacted as a part of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, is in pertinent part as follows:

"§ 1202(a) Any person who—

"(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, * * * and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both." 18 U.S.C. App. § 1202.

The indictment under which Stevens was convicted charged:

"That on or about the 26th day of December, 1969, in Harlan County, in the Eastern District of Kentucky,

FRANK JAMES STEVENS

having been convicted in a state court, to-wit, the Harlan Circuit Court, Harlan, Kentucky, on or about June 16, 1958, of a felony, that is, armed assault with intent to rob, in violation of the laws of the Commonwealth of Kentucky, and having been convicted in a state court, to-wit, the Oldham Circuit Court, LaGrange, Kentucky, on or about May 28, 1962, of a felony, that is, voluntary manslaughter in violation of the laws of the Commonwealth of Kentucky, willfully and knowingly possessed a firearm, that is, a 9mm Astra, Semi-automatic pistol, Serial No. 87270."

Stevens concedes that sufficient evidence was presented at the trial to prove every fact alleged in the indictment. It is contended, however, that the convic-

Paul E. Braden (Court Appointed), Corbin, Ky., for appellant.

Robert E. Rawlins, Lexington, Ky., Eugene E. Siler, Jr., U. S. Atty., Lexington, Ky., on the brief, for appellee.

Before PHILLIPS, Chief Judge, and EDWARDS and CELEBREZZE, Circuit Judges.

PHILLIPS, Chief Judge.

Two questions are presented on this appeal: (1) Is possession of a firearm by a person previously convicted of a felony a violation of federal criminal law

tion must be set aside because the indictment does not allege and the evidence does not establish that the possession of the firearm by Stevens was "in commerce or affecting commerce." A motion to dismiss the indictment on this ground was overruled by District Judge Bernard T. Moynahan, Jr.

The first question presents an issue of statutory construction: Whether the phrase "in commerce or affecting commerce" modifies the word "possesses" in the statute, and is, therefore, an element of the crime which must be charged and proved.

The second question presents an issue of constitutional law: Whether Congress has the power to make it a crime for a convicted felon to possess a firearm without proof of a connection between such possession and interstate commerce.

### 1) Interpretation of the Statute

■ The cardinal rule of statutory construction is that a statute must be construed, if possible, so as to give effect to the intent of Congress. Hudson Distributors, Inc. v. Eli Lilly & Co., 377 U.S. 386, 395, 84 S.Ct. 1273, 12 L.Ed.2d 394; Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 215, 82 S.Ct. 1328, 8 L.Ed.2d 440; Commissioner of Internal Revenue v. Bilder, 369 U.S. 499, 504, n. 5, 82 S.Ct. 881, 8 L.Ed.2d 65. Although other rules of construction may be used when legislative intent cannot be ascertained with certainty, none of the rules of statutory construction should be applied to accord a meaning to a statute contrary to clearly expressed legislative intent. See, e. g., United States v. An Article of Drug . . . Bacto-Unidisk, 394 U.S. 784, 801, 89 S.Ct. 1410, 22 L.Ed.2d 726; United States v. Standard Oil Co., 384 U.S. 224–225, 86 S.Ct. 1427, 16 L.Ed.2d 492; United States v. Zacks, 375 U.S. 59, 69, 84 S.Ct. 178, 11 L.Ed.2d 128.

We first examine both the language of the statute and its legislative history to determine whether there is a clear expression of Congressional intent.

### a) The Language of the Statute

■ Stevens contends that the phrase "in commerce or affecting commerce" qualifies not only the word "transports," but also the words "receives" and "possesses." The Government contends that this phrase modifies only the word "transports."

The language and punctuation of the statute are entirely consistent with the Government's position as to its interpretation. Stevens' position is weakened by the fact that the draftsmen of the statute did not place a comma immediately after the word "transports" and preceding the subject phrase. A comma so placed, in the absence of clear Congressional intent to the contrary, undoubtedly would support the construction advocated by Stevens. The absence of a comma after the word "transports" becomes more significant in light of the draftsmen's use of a comma immediately prior to the phrase "after the date of enactment of this Act" to indicate that this phrase was intended to modify each of the three words "receives," "possesses," and "transports."

Although the punctuation of the statute supports the interpretation urged by the Government, we do not base our decision on this ground. It is sufficient to find, as we do, that the phraseology and punctuation of the statute readily accommodate the construction urged by the Government if a clear expression of Congressional intent to that effect is found in the legislative history.

### b) The Legislative History

On July 17, 1967, the House Committee on the Judiciary reported out H.R. 5037, a crime control bill entitled "Law Enforcement and Criminal Justice Assistance Act of 1967." H.R.Rep.No.488, 90th Cong., 1st Sess. (1967). On August 8, 1967, this bill was passed by the House by a vote of 378 to 23 and sent to the

Senate. 113 Cong.Rec. 21860 (1967).[1] The bill did not contain 18 U.S.C. App. § 1202, at that time.

On April 29, 1968, the Senate Committee on the Judiciary reported out S. 917, a crime control bill entitled "Omnibus Crime Control and Safe Streets Act of 1967." S.Rep.No.1097, 90th Cong., 2d Sess. (1968). The bill did not contain § 1202 when it was reported out by the committee.

On May 23, 1968, a new Title VII containing the language of 18 U.S.C. App. § 1202, was added to S. 917 in an amendment offered and agreed to by voice vote on the floor of the Senate. 114 Cong.Rec. 14,775 (1968). After disposition of all amendments offered to S. 917, the Senate voted to amend H.R. 5037 by striking the text of the bill and substituting therefor the text of S. 917, as amended. *Id.* at 14798. On the same day, May 23, 1968, the Senate passed H.R. 5037, as amended, by a vote of 72 to 4, and returned it to the House. *Id.* at 14,798.

On June 5, 1968, the House rejected by a vote of 318 to 60 a motion to disagree with the Senate amendment to H.R. 5037 and thereby determined to vote on the bill without further committee study. 114 Cong.Rec. 16077 (1968). The following day, June 6, 1968, the House passed H.R. 5037, as amended by the Senate by a vote of 369 to 46. *Id.* at 16,300. H.R. 5037, now entitled "Omnibus Crime Control and Safe Streets Act of 1968," was signed into law by the President on June 19, 1968, designated as Pub.L. 90–351, 82 Stat. 197.

Since no Congressional committee studied § 1202 prior to its enactment, there is no committee report to aid in a determination of the legislative intent. The entire legislative history of the statute is contained in the pages of the *Congressional Record.* It is not, however, the quantity of legislative history which is important in determining legislative intent, but the quality and clarity of the insight it provides.

On May 17, 1968, the amendment adding Title VII, including the language of § 1202, to the Act, was first presented on the Senate floor. Senator Long of Louisiana, its sponsor, explained the amendment as follows:

"I have prepared an amendment which I will offer at an appropriate time, simply setting forth the fact that anybody who has been convicted of a felony or discharged from the Armed Forces for conditions other than honorable, has been adjudged by a court of the United States or State to be mentally incompetent, or, if he is a citizen of the United States, who has renounced his citizenship, or, if he is an alien, who is illegally and unlawfully in the United States he is not permitted to possess a firearm, and he would be punished by a sentence not to exceed 2 years in the penitentiary or a $10,000 fine, or both.

"It might be well to analyze, for a moment, the logic involved. When a man has been convicted of a felony, unless—as this bill sets forth—he has been expressly pardoned by the President and the pardon states that the person is to be permitted to possess firearms in the future, that man would have no right to possess firearms. He would be punished criminally if he is found in possession of them." 114 Cong.Rec. 13,868 (1968).

On May 23, 1968, the day Senator Long's amendment was agreed to by the Senate and immediately before the Senate passed H.R. 5037, as amended, with 76 Senators voting, the following explanation and discussion of the amendment occurred:

"Mr. LONG of Louisiana. Mr. President, the amendment has been on the desks of Senators for several days. I had it printed in the RECORD some time ago.

"What the amendment seeks to do is to make it unlawful for a firearm—be it a handgun, a machinegun, a long-range rifle, or any kind of firearm—

---

1. All references to the *Congressional Record* are to the permanent edition.

to be in the possession of a convicted felon who has not been pardoned and who has therefore lost his right to possess firearms. It would not apply to a person pardoned by a Governor or a President if the pardon specifically provides that he will have the right to carry firearms. He would then have that right. Otherwise, he would not have it. It also relates to the transportation of firearms.

"Mr. McCLELLAN. I have not had an opportunity to study the amendment. The Senator said something to the effect that if we could do this, we certainly could do that, under the Constitution. The thought that occurred to me as the Senator explained it, is that if a man had been in the penitentiary, had been a felon, and had been pardoned, without any condition in his pardon to which the able Senator referred, granting him the right to bear arms, could that man own a shotgun for the purpose of hunting?

"Mr. LONG of Louisiana. No, he could not. He could own it, but he could not possess it.

"Mr. McCLELLAN. I beg the Senator's pardon?

"Mr. LONG of Louisiana. This amendment does not seek to do anything about who owns a firearm. He could not carry it around; he could not have it.

"Mr. McCLELLAN. Could he have it in his home?

"Mr. LONG of Louisiana. No, he could not.

"This amendment would proceed on the theory that every burglar, thief, assassin, and murderer is entitled to carry a gun until the commission of his first felony; but, having done that, he is then subject to being denied the right to use those weapons again.

"Several Senators. Vote! Vote!" 114 Cong.Rec. 14,773–75 (1968).

The significance of the sponsor's explanation of the scope and meaning of an act to the subsequent judicial construction of its language has been recog-

nized repeatedly by the Supreme Court. National Woodwork Manufacturers Ass'n. v. N. L. R. B., 386 U.S. 612, 640, 87 S.Ct. 1250, 18 L.Ed.2d 357; N. L. R. B. v. Fruit & Vegetable Packers, 377 U.S. 58, 66, 84 S.Ct. 1063, 12 L.Ed.2d 129; Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394–95, 71 S. Ct. 745, 95 L.Ed. 1035.

On June 6, 1968, shortly before the House passed H.R. 5037, as amended by the Senate, with 415 Congressmen voting, the following explanation of Title VII of the bill was given on the House floor by Congressman Machen:

"Title VII prohibits the unlawful possession or receipt of firearms by felons, veterans who have been other than honorably discharged, mental incompetents, aliens who are illegally in the country, and former citizens who have renounced their citizenship. I believe this provision is necessary to a coordinated attack on crime and also a good complement to the gun-control legislation contained in title IV of this bill." 114 Cong.Rec. 16,286 (1968).

■ The entire legislative history of Senator Long's amendment, so far as disclosed by our research, has been extracted from the pages of the *Congressional Record* and attached to this opinion as Appendix A. We believe that the legislative history makes inescapable the conclusion that 18 U.S.C. App. § 1202(a) (1), was intended to make it a federal crime for a person previously convicted of a felony to possess a firearm under all circumstances except when granted that right in a pardon. Indeed, the legislative history reflects an intent to prohibit the possession of a firearm by a convicted felon in his own home. 114 Cong.Rec. 14,774 (1968).

Preceding § 1202 in the statute are the following Congressional findings and declaration, codified in § 1201:

"§ 1201. The Congress hereby finds and declares that the receipt, possession or transportation of a firearm by felons, veterans who are other than honorably discharged, mental incompe-

tents, aliens who are illegally in the country, and former citizens who have renounced their citizenship, constitutes—

"(1) a burden on commerce or threat affecting the free flow of commerce,

"(2) a threat to the safety of the President of the United States and Vice President of the United States,

"(3) an impediment or a threat to the exercise of free speech and the free exercise of a religion guaranteed by the first amendment to the Constitution of the United States, and

"(4) a threat to the continued and effective operation of the Government of the United States and of the government of each state guaranteed by article IV of the Constitution." 18 U.S.C. App. § 1201.

This language negatives any intent on the part of the Congress that a connection with commerce must be charged and proved as an element of the offense of possession of a firearm by a convicted felon under § 1202(a) (1).

Because the intent of Congress is expressed so clearly, there is no need to refer in depth to the contemporary circumstances under which the Omnibus Crime Control and Safe Streets Act of 1968 was passed or to the gravity of the national crisis which this statute sought to remedy. The assassination of President John F. Kennedy was followed by the assassinations of Dr. Martin Luther King on April 4, 1968, and Senator Robert F. Kennedy on June 5, 1968. Senator Kennedy's death was first announced on the floor of the House on June 6, 1968. 114 Cong.Rec. 16,227 (1968). Later that day the Act was passed by the House. *Id.* at 16,300.

We hold that, as the language and punctuation of the statute indicates, and as the legislative history of the statute makes clear, the phrase "in commerce or affecting commerce" does not modify the word "possesses" and is not an element of the crime of which Stevens was convicted.

The Courts of Appeals are in conflict on this issue. Our decision is in accord with the results reached by the Fourth, Eighth and Ninth Circuits. United States v. Synnes, 438 F.2d 764 (8th Cir.) ; United States v. Daniels, 431 F.2d 697 (9th Cir.) ; and United States v. Cabbler, 429 F.2d 577 (4th Cir.), *cert. denied,* 400 U.S. 901, 91 S.Ct. 138, 27 L.Ed.2d 138. We respectfully decline to follow the rationale of the Second Circuit expressed in United States v. Bass, 434 F.2d 1296.[2]

### 2)  The Constitutional Question

■■ We turn now to the consideration of whether Congress has the power to prohibit the possession of a firearm by a convicted felon. Since the Second Amendment right "to keep and bear Arms" applies only to the right of the State to maintain a militia and not to the individual's right to bear arms, there can be no serious claim to any express constitutional right of an individual to possess a firearm. United States v. Miller, 307 U.S. 174, 178, 59 S.Ct. 816, 83 L.Ed. 1206. Stevens asserts, however, that Congress is without constitutional power to deny him this privilege. We hold that Congress has this authority under the commerce clause.

2. There is also disagreement among the District Courts of this Circuit on this issue. The conclusion we have reached is in accord with the decision of the District Court for the Eastern District of Michigan, sitting in banc, in U. S. v. Vicary, No. 44,207, decided June 29, 1970. In U. S. v. Phelps, No. 14,465, (M.D. Tenn., Feb. 10, 1970) and U. S. v. Francis, No. 12,684 (E.D.Tenn., Dec. 12, 1969), District Courts reached the opposite conclusion. District Courts of other Circuits whose decisions have been brought to our attention also are divided. The conclusion we have reached is in accord with the decision in U. S. v. Boggs, No. 8138 (D.Wyo., June 17, 1970) and U. S. v. Wiley, 309 F.Supp. 141 (D. Minn.) ; *contra* U. S. v. Harbin, 313 F.Supp. 50 (N.D.Ind.).

The Constitution provides that "The Congress shall have the Power * * * to regulate Commerce with foreign Nations, and among the several States." U.S.Const., Art. I, § 8, cl. 3. Mr. Justice McKenna, writing for the majority in Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793, said:

"Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, 'designed to approach immortality as nearly as human institutions can approach it.' * * * And this has been recognized. The meaning and vitality of the Constitution have developed against narrow and restrictive construction.

*  *  *  *  *  *

"There are many illustrations of resistance to narrow constructions of the grants of power to the National Government. One only need be noticed, and we select it because it was made against a power which more than any other is kept present to our minds in visible and effective action. We mean the power over interstate commerce. This power was deduced from the eleven simple words, 'to regulate commerce with foreign nations and among the several States.' The judgment which established it was pronounced by Chief Justice Marshall (Gibbons v. Ogden [9 Wheat. 1, 6 L.Ed. 23]), and reversed a judgment of Chancellor Kent, justified, as that celebrated jurist supposed, by a legislative practice of fourteen years and fortified by the opinions of men familiar with the discussions which had attended the adop-

tion of the Constitution. Persuaded by such considerations the learned chancellor confidently decided that the Congressional power related to 'external, not to internal, commerce,' and adjudged that under an act of the State of New York, Livingston and Fulton had the exclusive right of using steamboats upon all of the navigable waters of the State. The strength of the reasoning was not underrated. It was supported, it was said, 'by great names, by names which have all the titles to consideration that virtue, intelligence and office can bestow.' The narrow construction, however, did not prevail, and the propriety of the arguments upon which it was based was questioned. It was said, in effect, that they supported a construction which 'would cripple the government and render it unequal to the objects for which it was declared to be instituted, and to which the powers given, as fairly understood, render it competent * *'." Id. at 373–375, 30 S.Ct. at 552–553.

The power of Congress to use the commerce clause to deal with the changing needs of an increasingly mobile and swiftly expanding frontier nation in 1824 was described by Chief Justice Marshall in Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23, as follows:

"It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution. * * * If, as has always been understood, the sovereignty of Congress * * * is plenary as to those objects [specified in the Constitution], the power over commerce * * * is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States. The wisdom and the discretion of Congress, their identity with the people, and the

influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments." *Id.* at 196–197.

These words were chosen by Mr. Justice Clark to describe this same power of Congress used in 1964 to "prohibit racial discrimination by motels serving travelers, however, 'local' their operations may appear." Heart of Atlanta Motel v. United States, 379 U.S. 241, 255–258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258.

In its above-quoted findings preceding § 1202, Congress declared that "the receipt, possession or transportation of a firearm by felons, * * * constitutes —(1) a burden on commerce or threat affecting the free flow of commerce. * * *" [18 U.S.C. App. § 1201] If this finding is accurate, there can be no doubt that Congress has the power to prohibit the possession of firearms by convicted felons. "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." Heart of Atlanta Motel v. United States, supra, at 258, 85 S.Ct. at 358; United States v. Women's Sportswear Mfrs. Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805. Further it is immaterial that some, or even most, convicted felons would not use their firearms to "pinch" interstate commerce. Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122; United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609. In *Darby*, the Supreme Court recognized that frequently the effective control of activities threatening interstate commerce requires the control of activities which pose no threat. *Id.* at 121, 61 S.Ct. 451. In Thornton v. United States, 271 U.S. 414, 46 S.Ct. 585, 70 L.Ed. 1013, the Court held that Congress may require the inspection of all cattle in a disease infected area without regard to whether they were to be shipped in interstate commerce. The treatment of all cattle was found necessary to protect interstate commerce from infected cattle, if any, that might subsequently be shipped.

In Wickard v. Filburn, *supra,* the Supreme Court held that the production of a small amount of wheat for consumption on the producing farm was within the reach of the commerce clause. The Court reasoned: "That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Supra* 317 U.S. at 127–128, 63 S.Ct. at 90. The farmer's only effect on interstate commerce in *Wickard* was that he might have purchased the same small amount of wheat on the open market if he had not produced it on his farm. Accordingly, under its commerce power, Congress may reach activities which, viewed in isolation, have minimal effects upon interstate commerce, when the total incident of all such activities, if left unchecked, may well become far reaching in its harm to commerce. Katzenbach v. McClung, 379 U.S. 294, 300–301, 85 S.Ct. 377, 13 L.Ed.2d 290; Polish National Alliance of United States v. N. L. R. B., 322 U.S. 643, 648, 64 S.Ct. 1196, 88 L.Ed. 1509.

We return then to consider the Congressional finding that firearms in the possession of convicted felons pose a threat to interstate commerce. A citation of authorities and statistics supporting this finding is unnecessary. All convicted felons have flouted the law at least once. The existence of an alarmingly high rate of recidivism among convicted felons has been established by unquestioned authority. In the instant case, Stevens after having committed armed assault in 1958, and after having committed voluntary manslaughter in 1962, was found in possession of a small deadly firearm in 1969. There can be no serious doubt that the possession of fire-

arms by convicted felons is a threat to interstate commerce. The statistics contained in Senate Report No. 1097, 90th Cong., 2d Sess. (1968), alone justify this conclusion. 18 U.S.C. App. § 1201(1), quoted above, is more than a Congressional finding. It is a statement of facts of public knowledge of which this Court will take judicial notice; e. g., firearms are used to highjack airplanes, rob banks insured by the Federal Deposit Insurance Corporation or commit other crimes seriously affecting commerce.[3]

Drug abuse, and the analogous national crisis it presents, was reached by Congress in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331. The courts have held that the total prohibition of certain acts defined in § 331 of the Act, and the imposition of criminal liability therefor, was permissible under the commerce clause without the necessity of proving a commerce connection in each case. United States v. Lamear, 417 F.2d 626 (8th Cir.), cert. denied, McEntire v. United States, 397 U.S. 967, 90 S.Ct. 1004, 25 L.Ed.2d 259; United States v. Cerrito, 413 F.2d 1270 (7th Cir.), cert. denied, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495; White v. United States, 395 F.2d 5 (1st Cir.), cert. denied, 393 U.S. 928, 89 S.Ct. 260, 21 L.Ed.2d 266. *See also* United States v. Biancofiori, 422 F.2d 584 (7th Cir.), cert. denied, 398 U.S. 942, 90 S.Ct. 1857, 26 L.Ed.2d 277.

It is not necessary for Congress to await the total dislocation of commerce before it may provide reasonable preventive measures for the protection of commerce. Katzenbach v. McClung, 379 U.S. 294, 301, 85 S.Ct. 377, 13 L.Ed.2d 290. "The power of Congress in this field is broad and sweeping; where it keeps within its sphere and violates no express constitutional limitation it has been the rule of this Court, going back almost to the founding days of the Re-

public, not to interfere." *Id.* at 305, 85 S.Ct. at 384.

■ It is of no consequence that Congress could have pursued other methods to eliminate the threat posed by armed convicted felons to interstate commerce. As said in Heart of Atlanta Motel v. United States, *supra,* 379 U.S. at 261–262, 85 S.Ct. at 360.

"[T]his is a matter of policy that rests entirely with the Congress not with the courts. How obstructions in commerce may be removed—what means are to be employed—is within the sound and exclusive discretion of the Congress. It is subject only to one caveat—that the means chosen by it must be reasonably adapted to the end permitted by the Constitution. We cannot say that its choice here was not so adapted. The Constitution requires no more."

The judgment of conviction is affirmed.

## APPENDIX A

### CONGRESSIONAL RECORD— SENATE

### May 17, 1968

### OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1967

The Senate resumed the consideration of the bill (S.917) to assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes.

### Amendment No. 802

Mr. LONG of Louisiana. Mr. President, I submit an amendment, intended to be proposed by me, to the bill (S.917).

I ask unanimous consent that the amendment be printed at this point in the Record.

---

3. In the final report of the National Commission on the Reform of Federal Criminal Laws, established by Congress in Public Law 89–801, 80 Stat. 1516, the majority of the Commission recommended that Congress "ban the production and possession of, and trafficking in, handguns, with exceptions only for military, police and similar official activities."

The PRESIDING OFFICER. The amendment will be received and printed, and will lie on the table; and, without objection, the amendment will be printed in the Record.

The amendment, ordered to be printed in the Record reads as follows:

On page 107, between lines 4 and 5, insert the following new title:

## "TITLE VII—UNLAWFUL POSSESSION OR RECEIPT OF FIREARMS

"Sec. 1201. The Congress hereby finds and declares that the receipt, possession, or transportation in commerce, of a firearm by felons, veterans who are other than honorably discharged, mental incompetents, aliens who are illegally in the country, and former citizens who have renounced their citizenship, constitutes—

"(1) a burden on commerce or threat affecting the free flow of commerce,

"(2) a threat to the safety of the President of the United States and Vice President of the United States,

"(3) an impediment or a threat to the exercise of the free speech and the free exercise of a religion guaranteed by the first amendment to the Constitution of the United States, and

"(4) a threat to the continued and effective operation of the Government of the United States and of the government of each State guaranteed by Article IV of the Constitution.

"Sec. 1202. (a) Any person who—

"(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, or

"(2) has been discharged from the armed forces under other than honorable conditions, or

"(3) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, or

"(4) having been a citizen of the United States has renounced his citizenship, or

"(5) being an alien is illegally or unlawfully in the United States,

and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,-000 or imprisoned for not more than two years, or both.

"(b) Any individual who being employed by any person who—

"(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, or

"(2) has been discharged from the armed forces under other than honorable conditions, or

"(3) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, or

"(4) having been a citizen of the United States has renounced his citizenship, or

"(5) being an alien is illegally or unlawfully in the United States,

and who, in the course of such employment, receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

"(c) As used in this title—

"(1) 'commerce' means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country;

"(2) 'felony' means any offense punishable by imprisonment for a term exceeding one year;

"(3) 'firearm' means any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an

explosive; the frame or receiver of any such weapon; or any firearm muffler or firearm silencer; or any destructive device. Such term shall include any handgun, rifle or shotgun;

"(4) 'destructive device' means any explosive, incendiary, or poison gas bomb, grenade, mine, rocket, missile, or similar device; and includes any type of weapon which will or is designed to or may readily be converted to expel a projectile by the action of any explosive and having any barrel with a bore of one-half inch or more in diameter;

"(5) 'handgun' means any pistol or revolver originally designed to be fired by the use of a single hand and which is designed to fire or capable of firing fixed cartridge ammunition, or any other firearm originally designed to be fired by the use of a single hand;

"(6) 'shotgun' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger;

"(7) 'rifle' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

"Sec. 1203. This title shall not apply to—

"(1) any prisoner who by reason of duties connected with law enforcement has expressly been entrusted with a firearm by competent authority of the prison; and

"(2) any person who has been pardoned by the President of the United States or the chief executive of a State and has expressly been authorized by the President or such chief executive, as the case may be, to receive, possess, or transport in commerce a firearm."

On page 107, line 5, strike out "TITLE V" and insert in lieu thereof "TITLE VIII".

On page 107, line 6 strike out "1001" and insert in lieu thereof "1301".

Mr. LONG of Louisiana. Mr. President it seems to me that the amendment I have prepared would go far toward solving the almost continual debate that has taken place over the gun question for years, ever since the assassination of President Kennedy. It seeks to bring together the people on both sides of this issue and also seeks to meet the constitutional problems involved.

A lot of people have objected to the Dodd gun bill on the theory it would make it difficult for honorable people— who have a right to have weapons for the defense of their homes to acquire weapons—and would make it somewhat cumbersome and burdensome for people to cross State boundaries seeking an opportunity to hunt or engage in other sports activities, as they have historically done in this country.

It would be burdensome on the hardware stores that sell firearms. A lot of people have felt that one way or the other it would impede the privileges and the rights that people have had historically.

It would be a bother to them, and it would not really prevent what it seeks to prevent in that it would not have, for example, prevented Oswald from acquiring the weapon with which he killed John Kennedy. And it would not have kept the assassin of Martin Luther King from acquiring the weapon he used for that dastardly act.

Generally speaking, it would have burdened good, honorable people without achieving enough good to make it worthwhile.

On the other hand, Mr. President, the best argument for the position of the Senator from Connecticut [Mr. Dodd] and those who share his view seems to have been that there are a lot of lunatics, mental incompetents, and members of the criminal element who have guns and have

been using guns to rob, plunder, and commit all sorts of crimes.

This, of course, is contrary to what we want. While we may be willing for a citizen to have a gun for the defense of his home—and I certainly have no objection to it—we do not want the murderers, the burglars, the rapists, the looters, or the arsonists armed to the teeth and walking the streets. We do not want the habitual criminals who have committed all sorts of crimes armed and presenting a hazard to law-abiding citizens.

That being the case, it makes good sense that we should see to it that citizens, as far as Federal law is concerned, can have weapons for self-defense.

I have prepared an amendment which I will offer at an appropriate time, simply setting forth the fact that anybody who has been convicted of a felony or discharged from the Armed Forces for conditions other than honorable, has been adjudged by a court of the United States or State to be mentally incompetent, or, if he is a citizen of the United States, who has renounced his citizenship, or, if he is an alien, who is illegally and unlawfully in the United States he is not permitted to possess a firearm, and he would be punished by a sentence not to exceed 2 years in the penitentiary or a $10,000 fine, or both.

It might be well to analyze, for a moment, the logic involved. When a man has been convicted of a felony, unless—as this bill sets forth—he has been expressly pardoned by the President and the pardon states that the person is to be permitted to possess firearms in the future, that man would have no right to possess firearms. He would be punished criminally if he is found in possession of them.

Let us take the case of men who have served in the Armed Forces. If it is found that a serviceman must be discharged for a reason other than honorable, because he has been convicted and has been given a dishonorable discharge or a bad conduct discharge, or if he has agreed to resign from service on condi-

tions less than honorable, he would forfeit his right to possess firearms.

Once again, this is a matter of saying that if he cannot be trusted to carry arms for Uncle Sam, he cannot be trusted to carry arms on the streets. This kind of person is part of the criminal element in many instances, the kind of person who does not know how to behave properly, and is a hazard to others when he possesses firearms.

A person who has been adjudged mentally incompetent should not carry firearms. That is too dangerous. Idiots and morons who carry high-powered rifles are a threat to citizens.

Also, if a person has renounced his citizenship and is not a citizen of this country, that would be a situation in which he has voluntarily given up certain rights that belong to an American citizen, which would include the right to bear arms. If he is an alien who is illegally in the United States, he should not be carrying firearms. He is one who should not be trusted to carry firearms.

Mr. President, if the report of the Warren Commission is correct and Oswald acted alone in the assassination of John F. Kennedy, a bill such as this could have prevented the assassination of President Kennedy by Lee Oswald. Oswald, as I understand, did not have an honorable discharge from the military service. I believe he had renounced his citizenship. For reasons involved in this bill, he would not have been permitted to possess firearms. And if he had managed to come into the possession of firearms illegally, most likely he would not have been such a good shot, because he would not have been able to practice the use of firearms, because people would have been aware that he had no right to possess or transport them.

It is my understanding that the committee seriously considered proceeding in this direction, but was deterred from doing so by what I believe was not the best of advice from the Department of Justice. The Department of Justice sent a letter to the Committee on the Judici-

ary—it can be found in the printed record of the hearings—indicating that they had a constitutional doubt that the Federal Government could outlaw the mere possession of weapons. I contend that the Federal Government can do so. I have discussed this matter with legislative counsel, and I believe they agree with me.

For example, there was much debate and discussion about the constitutionality of the Civil Rights Act of 1964, but many of the items and transactions reached by the broad swath of the Civil Rights Act of 1964 were reached by virtue of the power of Congress to regulate matters affecting commerce, not just to regulate interstate commerce itself. While I have had some doubts as to how far Congress should go in regulating matters affecting commerce, the Supreme Court decisions with regard to the Civil Rights Act of 1964, as well as other decisions, have clearly established the right of Congress, in the view of the Court, to regulate matters affecting commerce. So if you want to do something about this matter, the present state of the law, as interpreted by the Supreme Court would clearly permit you to reach either the possession or the transportation of weapons, in that this could affect commerce.

I refer to the bill. It will be noted that it says:

Congress hereby finds and declares that the receipt, possession and transportation of a firearm by felons, veterans who are other than honorably discharged, mentally incompetents, aliens who are illegally in this country, and former citizens who have renounced their citizenship, constitutes a burden on commerce or threat affecting the free flow of commerce.

So Congress simply finds that the possession of these weapons by the wrong kind of people is either a burden on commerce or a threat that affects the free flow of commerce.

You cannot do business in an area, and you certainly cannot do as much of it and do it as well as you would like, if in order to do business you have to go through a street where there are burglars, murderers, and arsonists armed to the teeth against innocent citizens. So the threat certainly affects the free flow of commerce.

Also, we clearly have a right to protect the life of the President of the United States. What happened with regard to the assassination of President Kennedy is a very good example. So we set forth that the possession of weapons by people of the type I have described—a description broad enough to include Mr. Oswald—would be a threat to the safety of the President of the United States and a threat to the safety of the Vice President of the United States. We employ many Secret Service agents to protect the lives of the President and the Vice President from people of that sort. We have passed a law making it a Federal crime for one to assassinate the President. If we have a right to pass that law, we certainly have a right to take measures to protect the lives of the President and the Vice President.

Then we say that the possession and transportation of firearms by these people is an impediment or a threat to the exercise of free speech and to the exercise of religion guaranteed by the first amendment to the Constitution of the United States. That clause, of course, could clearly pertain to this Government's right to protect citizens, such as Martin Luther King, who are expressing either religious or political views and whose life might be endangered because someone did not agree with what they were saying. But they have a right to say it. This would clearly justify the Federal Government in protecting the right of free speech guaranteed under the first amendment of the Constitution and in protecting freedom of religion.

We go on to say that the possession of firearms by people thus described would be a threat to the continued and effective operation of the Government of the United States and of the government of each State as guaranteed by article IV of the Constitution. The type of riots

that occurred after the assassination of Martin Luther King bordered on anarchy, and such lawlessness certainly is a threat to the continued and effective operation of government. The Government does have a right to protect itself and to maintain its own existence.

So, Mr. President it seems to me that the constitutional problem is not at all insurmountable. Any one of the constitutional connections I have mentioned would be adequate to support a statute such as I propose to offer; and all four of the constitutional connections—each in its own right—could support such a statute and could assure its constitutionality, in my judgment. Certainly, the combination of the four reaches that extent.

Mr. President, I shall read from a memorandum prepared by one of our fine lawyers in the legislative counsel discussing this problem:

It may be argued that the proposal to prohibit the receipt or possession, or transportation affecting commerce of any firearm by certain undesirable persons can be supported as a constitutional exercise of (1) the broad reach of the power of. Congress to regulate matters affecting commerce, as in title II of the Civil Rights Act of 1964—

In my judgment, we could stop there. That is all the authority we need to do what I propose.

The memorandum continues:

(2) the power of Congress to protect the life of the President of the United States and the Vice President of the United States, as in the recently enacted criminal provision related to presidential assassination, kidnapping, and assault of section 1751 of title 18 of the United States Code, (3) the authority of Congress to protect the fundamental rights of national citizens guaranteed by the Constitution and laws of the United States, here, the right of free speech and the free exercise of religion, and (4) the power of Congress to insure the continued operation of the Government of the United States freely elected by the people of the United States, and pursuant to Article IV of the Constitution, to guarantee to each State a republican form of government.

Mr. President, there is an additional provision which I recommend would take care of the underworld element which has been so successful. Having been found guilty of felonious conduct and denied the right to possess weapons themselves, they proceed to hire bodyguards, triggermen, and goon squads to go out and do their dirty work for them, all in the same general course of conduct. The murder-incorporated types, or the major underworld characters have been known to have so-called triggermen working for them.

If the boss is the kind of person whom I have described and he hires a triggerman to do his shooting for him, then while he is in the performance of his duties he would not be permitted to possess firearms.

Many people are concerned about the Mafia and concerned that some member of the Mafia may have a number of gun-carrying lieutenants working for them who would otherwise be permitted to possess firearms to endanger the lives of good citizens who are interested to do that which is right, as the Lord gives them the right to see it.

If a person is in the employ of a person who is not permitted to possess a firearm, then the employee would not be permitted in the performance of his employment to possess a firearm; and one who is either convicted of a felony, or for other reasons not permitted to carry weapons, would be covered.

It seems to me that this simply strikes at the possession of firearms by the wrong kind of people. It avoids the problem of imposing on an honest hardware store owner the burden of keeping a lot of records and trying to keep up with the ultimate disposition of weapons sold. It places the burden and the punishment on the kind of people who have no business possessing firearms in the event they come into possession of them.

Mr. President, I ask that the amendment be printed and available at the desk in due course and when we have occasion to discuss it and explain it I shall offer it to the Senate.

The PRESIDING OFFICER. The amendment will be received and printed, and will lie on the table.

Mr. LONG of Louisiana. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. LONG of Louisiana. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

## THE SUSPECTED KILLER OF MARTIN LUTHER KING

Mr. LONG of Louisiana. Mr. President, in connection with my earlier statement, I think it might be well to have printed in the Record an article that was published in Life magazine discussing the background and record of the man who is suspected of having killed Dr. King. The article starts on page 20 of Life magazine, and includes interviews associated with the article.

The article makes clear that this man who is suspected of this murder was a convicted felon, having committed a number of serious offenses and having been convicted.

Assuming that what is thought with respect to the assassin is correct, as I have indicated, the proposal which I have sent to the desk perhaps would have saved the life of Martin Luther King and the life of President Kennedy, as well.

Mr. President, I ask unanimous consent to have printed in the Record the article entitled "The Story of the Accused Killer of Dr. King," published in Life magazine on May 3, 1968. 114 Cong.Rec. 13,867–69 (1968).

May 23, 1968

Amendment No. 820

Mr. LONG of Louisiana. Mr. President, I call up my amendment No. 820, and ask that it be stated.

The PRESIDING OFFICER. The amendment will be stated.

The assistant legislative clerk proceeded to state the amendment.

Mr. LONG of Louisiana. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered; and the amendment will be printed in the Record.

The amendment, ordered to be printed in the Record, reads as follows:

On page 107, between lines 4 and 5, insert the following new title:

## "TITLE VII—UNLAWFUL POSSESSION OR RECEIPT OF FIREARMS

"Sec. 1201. The Congress hereby finds and declares that the receipt, possession, or transportation of a firearm by felons, veterans who are other than honorably discharged, mental incompetents, aliens who are illegally in the country and former citizens who have renounced their citizenship, constitutes—

"(1) a burden on commerce or threat affecting the free flow of commerce,

"(2) a threat to the safety of the President of the United States and Vice President of the United States,

"(3) an impediment or a threat to the exercise of free speech and the free exercise of a religion guaranteed by the first amendment to the Constitution of the United States, and

"(4) a threat to the continued and effective operation of the Government of the United States and of the government of each state guaranteed by article IV of the Constitution.

"Sec. 1202. (a) Any person who—

"(1) has been convicted by a court of the United States or of a State or any

political subdivision thereof of a felony, or

"(2) has been discharged from the Armed Forces under other than honorable conditions, or

"(3) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, or

"(4) having been a citizen of the United States has renounced his citizenship, or

"(5) being an alien is illegally or unlawfully in the United States,

and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

"(b). Any individual who to his knowledge and while being employed by any person who—

"(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, or

"(2) has been discharged from the Armed Forces under other than honorable conditions, or

"(3) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, or

"(4) having been a citizen of the United States has renounced his citizenship, or

"(5) being an alien is illegally or unlawfully in the United States,

and who, in the course of such employment, receives, posseses, or transports in commerce or affecting commerce, after the date of the enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

"(c) As used in this title—

"(1) 'Commerce' means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country;

"(2) 'felony' means any offense punishable by imprisonment for a term exceeding one year;

"(3) 'firearm' means any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; or any firearm muffler or firearm silencer; or any destructive device. Such term shall include any handgun, rifle, or shotgun;

"(4) 'destructive device' means any explosive, incendiary, or poison gas bomb, grenade, mine, rocket, missile, or similar device; and includes any type of weapon which will or is designed to or may readily be converted to expel a projectile by the action of any explosive and having any barrel with a bore of one-half inch or more in diameter;

"(5) 'handgun' means any pistol or revolver originally designed to be fired by the use of a single hand and which is designed to fire or capable of firing fixed cartridge ammunition, or any other firearm originally designed to be fired by the use of a single hand;

"(6) 'shotgun' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger;

"(7) 'rifle' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

**160**

"Sec. 1203. This title shall not apply to—

"(1) any prisoner who by reason of duties connected with law enforcement has expressly been entrusted with a firearm by competent authority of the prison; and

"(2) any person who has been pardoned by the President of the United States or the chief executive of a State and has expressly been authorized by the President or such chief executive, as the case may be, to receive, possess, or transport in commerce a firearm."

On page 107, line 5, strike out "TITLE V" and insert in lieu thereof "TITLE VIII".

On page 107, line 6 strike out "1001" and insert in lieu thereof "1301".

Mr. LONG of Louisiana. Mr. President, the amendment has been on the desks of Senators for several days. I had it printed in the Record some time ago.

What the amendment seeks to do is to make it unlawful for a firearm—be it a handgun, a machinegun, a long-range rifle, or any kind of firearm—to be in the possession of a convicted felon who has not been pardoned and who has therefore lost his right to possess firearms. It would not apply to a person pardoned by a Governor or a President if the pardon specifically provides that he will have the right to carry firearms. He would then have that right. Otherwise, he would not have it. It also relates to the transportation of firearms.

It would also apply to veterans who are other than honorably discharged. It would apply also to mentally incompetents and aliens illegally in the country and to former citizens who have renounced their citizenship.

The reason I particularly wanted these categories covered is that this would make it apply to the gun Oswald had with which he killed John F. Kennedy.

It would mean that Oswald, having been a man who was discharged from the service under conditions other than honorable—and that is one of the conditions set forth here—and a man who had renounced his citizenship, unless he had been restored by the President of the United States to the right to carry a rifle, would not have had the right to carry that gun or practice with it or do anything else with it.

Assuming that the statistics of the Federal Bureau of Investigation are correct and that this man Galt—a loser many times over, a felon, and an habitual criminal—was the man who killed Martin Luther King, this provision would have applied to him, too.

I have researched the constitutional authorities, and I ask unanimous consent to have them printed at this point in the Record.

There being no objection, the material was ordered to be printed in the Record, as follows:

#### Unlawful Possession or Receipt of Firearms

#### Proposed Title VII of H.R. 5037

This proposed title would make it a Federal crime for the following classes of persons to receive, possess, or transport any firearm in commerce, or affecting commerce:

1. Convicted felons.

2. Persons discharged from the Military under other than honorable conditions.

3. Mental incompetents.

4. Persons who have renounced their United States citizenships.

5. Aliens illegally in this Country.

In addition the Title would prohibit persons employed by another from receiving, possessing or transporting a firearm in the course of his employment if he knows his employer is in a class described in clauses 1–5 above. These are the mobsters—the hired gunmen.

Clauses 1–5 describe persons who, by their actions, have demonstrated that they are dangerous, or that they may become dangerous. Stated simply, they may not be trusted to possess a firearm without becoming a threat to society.

This title would apply both to hand guns and to long guns.

The recent history of this Country is full of illustrations of assassinations and murders committed with firearms by persons described in clauses 1–5.

President John F. Kennedy's assassin had been separated from the Military with an undesirable discharge after he had moved to Russia and indicated a desire to renounce his United States citizenship.

Martin Luther King's assassin was a convicted felon.

The killer of Mrs. Viola Liuzzo (the civil rights worker shot during the 1965 march from Selma to Montgomery, Alabama) was a convicted felon by virtue of his violation of the Federal Firearms Act.

All of these murderers had shown violent tendencies before they committed the crime for which they are most infamous. They should not have been permitted to possess a gun. Yet, there is no Federal law which would deny possession to these undesirables.

The killer of Medgar Evers, the murderer of the three civil rights workers in Mississippi, the defendants who shot Captain Lemuel Penn (on a highway while he was driving back to Washington after completion of reserve Military duty) would all be free under present Federal law to acquire another gun and repeat those same sorts of crimes in the future.

The assassin of George Lincoln Rockwell and the murderer of Malcolm X could lawfully acquire a gun upon their release from prison and kill again.

Of all the gun bills that have been suggested, debated, discussed and considered, none except this Title VII attempts to bar possession of a firearm from persons whose prior behaviors have established their violent tendencies. In large part, Title VII is based on the legal theory that every dog is entitled to one bite. If one owns a dog and it attacks his neighbor, the owner is not liable if he did not know that his dog was dangerous. But if the dog thereafter attacks a second neighbor, the owner is liable because he has been placed on notice that his dog is dangerous.

So, under Title VII, every citizen could possess a gun until the commission of his first felony. Upon his conviction, however, Title VII would deny every assassin, murderer, thief and burglar of the right to possess a firearm in the future except where he has been pardoned by the President or a State Governor and has been expressly authorized by his pardon to possess a firearm.

It has been said that Congress lacks the power to outlaw mere possession of weapons. The argument apparently stems from the fact that our founding fathers did not expressly delegate police powers to the Federal Government. And that being the case, it is said that such powers are reserved to the States under the 10th Amendment to the Constitution.

However, that argument overlooks the fact that Congress for years has controlled the possession of gangster-type weapons such as machine guns, sawed-off shotguns and firearms silencers. This controlling legislation was enacted under the Federal taxing power and its validity was upheld by the Supreme Court. The important point is that this legislation demonstrates that possession of a deadly weapon by the wrong people can be controlled by Congress, without regard to where the police power resides under the Constitution.

Without question, the Federal Government does have power to control possession of weapons where such possession could become a threat to interstate commerce, or to the protection of the Constitutional rights of free speech and the free exercise of religion or to the insurance of the continued orderly operation of the Government of the United States. The Federal Government also has a responsibility under the 4th amendment to the Constitution to guarantee to each State a republican form of government. Similarly, the Federal government now has a statutory obligation to protect the

life of the President of the United States and of the Vice-President.

State gun control laws where they exist have proven inadequate to bar possession of firearms from those most likely to use them for unlawful purposes. They did not stop Lee Harvey Oswald. They did not stop Eric Starvo Galt—or James Earl Ray.

Clearly, if the Federal Government has the responsibility for insuring the orderly course of commerce and for protecting the rights of citizens and the lives of our leaders, it cannot be argued that Congress is without power to enact legislation reasonable and necessary to carry out its responsibility. The rioting which followed the brutal slaying of Martin Luther King during which more than 200 cities across this land were set afire demonstrates more vividly than words how the murder of a single man can disrupt the free and orderly flow of interstate commerce.

We have an obligation both under the Constitution and under the Federal statutes to try and prevent that sort of killing and that sort of aftermath from happening again. We have an obligation to try and protect the lives of our citizens in exercising their rights of free speech and their choice of religion.

The vast reach of the Federal power to control matters affecting interstate commerce, once thought to be beyond Federal legislation, has been demonstrated by the broad swath of the Civil Rights Act of 1964 and by the still broader scope of the 1968 civil rights legislation. No one can argue that Martin Luther King's murder did not affect commerce. Look at our cities and how stores and business engaged in interstate commerce were burned, looted and pillaged by rioting mobs protesting his death.

Title VII would not substitute Federal control of possession of firearms for State control. It denies the States nothing in the exercise of their police powers. It supplements the State law and buttresses it.

Nor would Title VII impinge upon the rights of citizens generally to possess firearms for legitimate and lawful purposes. It deals solely with those who have demonstrated that they cannot be trusted to possess a firearm—those whose prior acts—mostly voluntary—have placed them outside of our society. Their very acts show that society must be protected from them. They have no right, constitutional or otherwise, to prey upon and menace our leaders, or our citizens who are pursuing their own constitutional rights. Nor are they privileged to threaten or otherwise affect our commerce.

Despite all that has been said about the need for controlling firearms in this Country, no other amendment heretofore offered would get at the Oswalds or the Galts. They are the types of people at which Title VII is aimed.

Mr. LONG of Louisiana. I am convinced that we have enough constitutional power to prohibit these categories of people from possessing, receiving, or transporting a firearm. While this, of course, could not have saved every person who has been assassinated—certainly, it would not have saved my father— at the same time, it would apply to many of the most fiendish assassinations that have occurred in our time. It should apply for a number of reasons.

First. Congress has the right to regulate matters that affect interstate commerce. We went to the extreme in that respect, may I say, in the civil rights laws and the open housing laws. If we can tell someone who can and who cannot possess a house, which is certainly not an object moving in interstate commerce, it seems to me that we have a right to say who can possess a long-range rifle.

Second. If we have a right to pass a law, as we did, to make it a crime to murder the President of the United States, then we can pass a law to help protect the President and the Vice President. Indeed, if we wish, we can pass a law to protect the very existence of government from anarchy.

For example, as long as the marchers in Washington behave themselves, fine. But when they start violating the law, as some did today, when they blocked the passageways and corridors of the House, as I am told, it would be comforting to know that among those people blocking the halls so that Congressmen cannot pass are not a group of convicted felons who have been convicted of murder, dope peddling, and crimes of that nature, and that they are not armed to the teeth with shotguns or high-powered rifles.

This amendment would provide that a convicted felon who participates in one of these marches and is carrying a firearm would be violating the law. That would make society safer, it would make the National Capital safer, and it would make government safer and more secure.

I have discussed this matter with the distinguished managers of the bill, and, so far as I know, they do not object to it; and I hope very much that it will be agreed to. I believe it would strengthen the bill and make it a better bill.

Mr. DODD. Mr. President, will the Senator yield?

Mr. McCLELLAN. I yield such time to the Senator from Connecticut as he may desire.

Mr. DODD. Do I correctly understand that this amendment is not a substitute for title IV?

Mr. LONG of Louisiana. This amendment would take nothing from the bill. I applaud what the committee did. This would add to the fine work the committee did in this area.

Mr. McCLELLAN. I have not had an opportunity to study the amendment. The Senator said something to the effect that if we could do this, we certainly could do that, under the Constitution. The thought that occurred to me, as the Senator explained it, is that if a man had been in the penitentiary, had been a felon, and had been pardoned, without any condition in his pardon to which the able Senator referred, granting him the right to bear arms, could that man own a shotgun for the purpose of hunting?

Mr. LONG of Louisiana. No, he could not. He could own it, but he could not possess it.

Mr. McCLELLAN. I beg the Senator's pardon?

Mr. LONG of Louisiana. This amendment does not seek to do anything about who owns a firearm. He could not carry it around; he could not have it.

Mr. McCLELLAN. Could he have it in his home?

Mr. LONG of Louisiana. No, he could not.

Mr. McCLELLAN. Can we, under the Constitution, deny a man the right to keep a gun in his home?

Mr. LONG of Louisiana. When a man is a convicted felon, he can be denied many of the rights that he otherwise would be entitled to possess. For example, suppose he has been discharged for the good of the service, which means that he is going to accept the discharge under conditions to avoid being tried. If he is a veteran who has been discharged under conditions other than honorable, when he accepts that discharge, he knows he is giving up the right to carry firearms. If he cannot be trusted to bear arms for Uncle Sam, I do not believe we should trust him to carry firearms, knowing how dangerous those weapons can be and what has been done with them.

Mr. McCLELLAN. I only raise the point as to what the amendment may do. It may go too far.

I have discussed it with the Senator from Connecticut [Mr. Dodd] and the Senator from Nebraska [Mr. Hruska], who are vitally interested in title IV, which is the arms section of the bill. They are both willing to take the matter to conference and study it. Unless someone objects, I shall accept it for the purpose of studying it and try to understand it.

Mr. LONG of Louisiana. Mr. President, with regard to the point raised by

the Senator, there is absolutely no doubt in my mind that, applied purely prospectively to people who are convicted of crimes in the future, the amendment could not be subject to any challenge whatever. It is likely that one might argue that by applying this amendment to people who have been convicted of crimes prior to this date and pardoned by the pardoning authority, their rights might be violated. That is something that can be studied in conference.

Mr. McCLELLAN. I do not want to say that I will take it to conference and then not give it further thought, because I believe it requires further thought.

Mr. LONG of Louisiana. I would certainly welcome the Senator's consideration of it.

Mr. DODD. Mr. President, will the Senator yield?

Mr. LONG of Louisiana. I yield.

Mr. DODD. My own feeling is that I am a little uneasy about it, but I believe that the Senator from Arkansas has stated the situation the way it should be stated, and we will study it. I do not believe that it would do any harm.

Mr. DOMINICK. Mr. President, will the Senator yield?

Mr. LONG of Louisiana. I yield.

Mr. DOMINICK. Mr. President, I am in sympathy with the objective of the Senator from Louisiana of getting to the person behind the gun instead of getting at the gun, which I believe has been the main impact of most of the proposed firearms legislation up to now. I wish to ask the Senator some questions.

The Senator referred to people who have been discharged from the Armed forces under other than honorable conditions. Suppose a man is discharged on a medical discharge? Is this a discharge under other than honorable conditions, within the meaning of your amendment? And suppose he is cured? I believe there are a number of instances in which it would be going too far to say that a man could no longer participate in duck shooting or pheasant shooting.

Mr. LONG of Louisiana. Frankly, I say to the Senator that I believe he would find that a man who receives a medical discharge from the service can be honorably discharged. There is a type of medical discharge that applies to certain undesirable people. Those people accept that type of discharge, for the good of the service, rather than face trial. I had in mind that those people, if they went to trial, would probably be discharged with a bad conduct discharge or a dishonorable discharge; but if they accepted a discharge rather than face trial, that would apply.

If there were any problem about this matter in conference, it would be easy to iron out by saying that, in the case of a medical discharge, if it is clear that the patient was discharged for health reasons—he was incapable of bearing his share of the load and doing his job —it would not apply to him.

But I believe the Senator will find that a medical discharge, for example, in the instance of a stroke or a heart attack, when a man is not able to serve, is not a discharge under conditions other than honorable.

Mr. DOMINICK. I support the idea of the Senator. I have a feeling that perhaps we have gone too far, but perhaps this matter can be worked out in conference.

Mr. LONG of Louisiana. May I say to the Senator that this amendment is based on the theory in law that every dog is entitled to one bite. A person who is not a lawyer might say, "How could you arrive at that conclusion?"

That is based on the old theory that if one owns a dog and the dog attacks his neighbor, the owner is not liable if he did not know that the dog was dangerous. But if the dog attacks one neighbor, and it is a serious injury, and thereafter attacks someone else, the owner is on notice that the dog is dangerous.

This amendment would proceed on the theory that every burglar, thief, assassin, and murderer is entitled to carry a gun until the commission of his first

felony; but, having done that, he is then subject to being denied the right to use those weapons again.

SEVERAL SENATORS. Vote! Vote!

Mr. McCLELLAN. Mr. President, I yield back the remainder of my time.

Mr. LONG of Louisiana. I yield back the remainder of my time.

The PRESIDING OFFICER. All time having been yielded back, the question is on agreeing to the amendment of the Senator from Louisiana. [Putting the question.]

The amendment of Mr. Long of Louisiana was agreed to. 114 Cong.Rec. 14,-772-75 (1968)

CONGRESSIONAL RECORD—HOUSE

June 6, 1968

PROVIDING FOR AGREEING TO SENATE AMENDMENT TO H.R. 5037, LAW ENFORCEMENT AND CRIMINAL JUSTICE ASSIST-ANCE ACT OF 1967

Mr. SISK. Mr. Speaker, by direction of the Committee on Rules, I call up House Resolution 1197 and ask for its immediate consideration.

The Clerk read the resolution, as follows:

H. Res. 1197

*Resolved,* That, immediately upon the adoption of this resolution, the bill (H.R. 5037) to assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes, with the Senate amendment thereto, be, and the same hereby is, taken from the Speaker's table, to the end that the Senate amendment be, and the same is hereby, agreed to.

\* \* \* \* \* \*

Mr. TEAGUE of Texas. Mr. speaker, I should just like to point out something in this bill which the House is doing

today which I certainly do not believe we want to do.

On page 126 of the bill the words are used: "veterans who are other than honorably discharged," and then, below that, the words are: "a threat to the safety of the President of the United States and Vice President of the United States."

Mr. Speaker, between a dishonorable discharge and an honorable discharge there are four other kinds of discharges: undesirable, bad conduct, resigned for the good of the service, and general. On some of those discharges we give the veteran every benefit of the GI bill.

To say this in this bill, "other than honorably discharged" seems to me we are making a big mistake.

\* \* \* \* \* \*

Mr. MACHEN. Mr. Speaker, I support the motion that we agree with the Senate amendments to H.R. 5037 and send this bill to the President. The need for this legislation is immediate and pressing. Since, under the rules of the House, we must either accept or reject the Senate amendments in full or face the prospect of a long drawn out conference, I urge that we accept this bill as it is now written and then move quickly to enact whatever legislation is needed to strengthen and expand it. When this legislation was initially considered by the House last year, H.R. 5037 was only 28 pages long. The bill we are considering today is over 100 pages. Obviously the legislation we are considering today is much more substantive than that which was considered last year. \* \* \*

Title VII prohibits the unlawful possession or receipt of firearms by felons, veterans who have been other than honorably discharged, mental incompetents, aliens who are illegally in the country, and former citizens who have renounced their citizenship. I believe this provision is necessary to a coordinated attack on crime and also a good complement to the gun-control legislation contained in title IV of this bill.

\* \* \* \* \* \*

Mr. RANDALL. Mr. Speaker, I rise in support of H.R. 5037, the omnibus crime bill, as passed by the Senate. It seems like a long while since the House passed its version of the crime bill and sent it to the Senate. But it will be recalled that late in the month of May the Senate enacted a greatly amended version of our bill which contained what some regarded as controversial provisions, including title II, covering the admissibility of confessions, title III, electronic surveillance of wiretapping, and Title IV and VI, relating to the regulation of firearms. * * *

I come now to consideration of title IV and title VI of the omnibus crime bill relating to regulation of firearms. Over the years I have been on record in several instances in support of the constitutional right of every citizen to bear arms. The act of the assailant in the Ambassador Hotel in Los Angeles early on the morning of June 5 just past, can create a state of emotional hysteria which could lead in the future to efforts for firearms legislation which would take away the right of our sportsmen and even our law-abiding citizens. Those who want a severe, restrictive bill refer to title IV and VI as a watered-down, halfway measure because these titles happen to apply only to hand guns.

On the other hand, the provisions of H.R. 5037 as to firearms should be of help in the control of crime. For example the bill provides it shall be unlawful to transport or receive in interstate and foreign commerce firearms with altered or obliterated serial numbers. Title VI should accomplish some good. It makes illegal possession of firearms by mental incompetents and aliens illegally in this country. The provision that makes unlawful possession of firearms by our veterans who may have received something less than a full honorable discharge I regard as unwise because many of the veterans have rehabilitated themselves and yet have not received a pardon by the President of the United States. They should not be put in the same class as felons or aliens illegally in this country.

* * * * * *

Mr. POLLOCK. * * *

Mr. Speaker, I know that much legislative history has been written on this Omnibus Crime Control and Safe Streets Act of 1968. However, to provide a simple and reasonably concise résumé of the major provisions of the bill which we are called upon to enact today, I submit the following explanation for the record:

* * * * * *

## TITLE VII—INTERSTATE TRANSPORTATION OF FIREARMS

This section makes it a Federal crime to take, possess, or receive a firearm across State lines when the person involved: First, has been convicted of a crime punishable by imprisonment for a term exceeding 1 year; second, has been discharged from the Armed Forces for reasons other than honorable; third, is mentally incompetent; fourth, has renounced U.S. citizenship; or fifth, is an alien illegally in the United States. There are also penalties for employers who have knowledge of an employee guilty of any of the provisions above. The overall thrust is to prohibit possession of firearms by criminals or other persons who have specific records or characteristics which raise serious doubt as to their probable use of firearms in a lawful manner. I agree with this provision and feel this title alone provides the gun legislation portion necessary under this bill, without need for enactment of title IV. 114 Cong.Rec. 61,270–98 (1968)

CELEBREZZE, Circuit Judge (dissenting).

I respectfully dissent. I believe that the words "in commerce or affecting commerce" in 18 U.S.C. (App.) § 1202 (a) (1) (Supp.V.1970) modify not only the word "transports," but also the words "receives" and "possesses." I therefore believe that the Appellant's indictment for the mere possession of a

firearm under section 1202(a) (1) should have been dismissed, and his conviction overturned. In finding the contrary, the majority overlooks two important canons of statutory construction, and misapprehends a third.

First, if a criminal statute is capable of inconsistent interpretations, the ambiguity is resolved in favor of lenity. *See, e. g.,* Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955); United States v. Phelps, Crim. Nos. 14,465 & 14,468 (M.D.Tenn., Feb. 10, 1970). The more lenient interpretation of section 1202(a) (1) is that requiring the Government to prove that receipt or possession was "in commerce or affecting commerce."

> "It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment. This in no wise implies that language used in criminal statutes should not be read with the saving grace of common sense with which other enactments, not cast in technical language, are to be read." Bell v. United States, *supra,* 349 U.S. at 83, 75 S.Ct. at 622.

This quotation suggests the second principle, which the majority overlooks: an ambiguous statute will be construed to avoid an absurd or illogical result. *See, e. g.,* United States v. Bass, 434 F.2d 1296 (2d Cir., 1970). The Government argues that the word "transports" is the only word modified by the "in commerce or affecting commerce" requirement; the majority of this panel finds that this interpretation is buttressed by the draftsmen's placement of commas. Technically precise as this argument may be, as the Court in *Bass* pointed out, it leads to an illogical conclusion:

> "Interpreting the commerce requirement to modify only the 'transports' clause means that, although intrastate receipt and possession are punishable under the statute, intrastate transportation is not. Moreover if both 'receipt' and 'possession' are punishable without regard to the interstate

elements, the modifying clause is meaningless, since there can scarcely be 'transportation,' whether intrastate or interstate, without an accompanying receipt or possession. Thus, in order to argue that a commerce requirement is not imposed by the statute on 'receipt' or 'possession,' the government is forced to take the position that the commerce requirement of the statute is either totally illogical or mere surplusage." United States v. Bass, *supra,* at 1298.

The third and most substantial difficulty I have with the majority's construction of section 1202(a) (1) is that it raises, rather than avoids, serious constitutional doubts. *See* Zwickler v. Koota, 389 U.S. 241, 249, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (concurring opinion of Mr. Justice Brandeis); Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927). I believe the majority's construction of this statute compels the use of a statutory presumption that presents substantial constitutional questions.

In order to sustain its burden of proof in a criminal proceeding, the Government must prove beyond a reasonable doubt each element of the crime with which the defendant is charged. *See e. g.,* Turner v. United States, 396 U.S. 398, 405, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); Tot v. United States, 319 U.S. 463, 466–467, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943); United States v. Adams, 293 F.Supp. 776, 783–784 (S.D.N.Y. 1968). This is not to say that, under appropriate circumstances, some elements may not be inferred by the jury from facts proven, or be supplied by a constitutional statutory presumption. Tot v. United States, *supra,* 319 U.S. at 467, 63 S.Ct. 1241. Where, as in the instant case, Congress enacts a criminal statute pursuant to its commerce power, either interstate commerce or an adverse effect on interstate commerce is an element of the crime. *Cf.* Mortensen v. United States, 322 U.S. 369, 64 S.Ct. 1037, 88

L.Ed. 1331 (1944); Hattaway v. United States, 399 F.2d 431, 433 (5th Cir. 1968). As any other element it must be proved by direct or circumstantial evidence, or supplied by a statutory presumption. The majority holds that direct or circumstantial proof of commerce is unnecessary to sustain a conviction under section 1202(a) (1). To so hold, the majority must find a statutory presumption in section 1202(a) (1) to the effect that a firearm possessed by an individual previously convicted of a felony is a burden on interstate commerce. I believe this presumption is constitutionally impermissible.

It has long been established that in order for a criminal statutory presumption to be constitutional, there must be a "rational connection between the facts proved and the fact presumed." Tot v. United States, *supra,* 319 U.S. at 467, 63 S.Ct. at 1245. See United States v. Romano, 382 U.S. 136, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965); United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L. Ed.2d 658 (1965). Precisely when a "connection" is to be considered "rational" is a question that the Supreme Court has not completely answered. In Leary v. United States, 395 U.S. 6, 36, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57 (1969), the Court stated that a criminal statutory presumption will "be regarded as 'irrational' or 'arbitrary,' and hence unconstitutional, unless it can *at least* be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." (Emphasis added.) In a footnote to *Leary,* 395 U.S. at 36, n. 64, 89 S.Ct. 1532, and in a subsequent case, Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), the Court strongly suggested that if proof of an element of a crime is to be supplied by a statutory presumption, then in order for the presumption to be constitutional, the "connection" between the fact proved and the fact presumed

must be the same as the Government's burden of proof of all other elements of the crime, *i. e.,* beyond a reasonable doubt.

In order to sustain the presumption the majority finds in section 1202(a) (1) under the *Leary* standard, we must "at least" be able to say with "substantial assurance" that it is more likely than not that a firearm possessed by an individual previously convicted of a felony will be used in such a manner as to be a burden on interstate commerce.[1]

The Supreme Court has instructed that unless common sense tells us that the presumed fact is at least more likely than not to flow from the proved fact, then the Court must make a "highly empirical" study, granting to the factual finding of Congress "significant weight."

" 'The process of making the determination of rationality is, by its nature, highly empirical, and in matters not within the specialized judicial competence or completely commonplace, significant weight should be accorded the capacity of Congress to amass the stuff of actual experience and cull conclusions from it.' 380 U.S. at 67, 85 S.Ct., at 757." Leary v. United States, *supra,* 395 U.S. at 35, 89 S.Ct. at 1547.

Since the determination of rationality in the instant case is not one within "specialized judicial competence," or "completely commonplace," or involving "common sense," 395 U.S. at 46, 89 S.Ct. 1532, it is improper to judicially notice, without a "highly empirical" study of the facts reviewed by Congress in creating the presumption, that 51 percent or more of the guns possessed by previously convicted felons burden interstate commerce. Nor can we make a "highly empirical" study of the "stuff of actual experience" amassed by Congress, because the legislative history, which the majority quotes in the appendix to its opinion, recites no facts or statistics from which the determination of rationality

---

1. In view of my determination that this presumption does not withstand constitutional scrutiny under the *Leary* standard, I do not reach the question whether the stricter standard applies.

can be made, *see* 395 U.S. at 38–39, 89 S.Ct. 1532. As the majority points out, *ante* p. ——, no congressional committee studied the section prior to its enactment, and there was no committee report. "All that is present in the 'debates' is statements by the bill's author based on nothing but conjecture and a series of inferences which, if accepted, would support federal legislation concerning almost any criminal matter." United States v. Bass, *supra,* 434 F.2d at 1300. The majority relies heavily upon the "congressional finding" in section 1201 (1) that the possession of firearms by certain individuals is a burden on commerce. Unsupported by the requisite legislative findings, this congressional edict does not make the presumed fact "more likely than not" true. The majority further cites Senate Report No. 1097, 90th Cong. 2d Sess. (1968) to prove that "[t]here can be no serious doubt that the possession of firearms by convicted felons is a threat to interstate commerce." *Ante,* p. 152. There is nothing in that report, however, to prove that it is "more likely than not" that a gun possessed by a previously convicted felon will be a burden on commerce, or, as the majority states it, "used to hijack airplanes, rob banks insured by the` Federal Deposit Insurance Corporation or commit other crimes seriously affecting commerce." *Ante,* p. 152. *See* 2 U.S.Code Cong. and Admin.News, pp. 2163–2168 (1968). The section of that report dealing with firearms does not even consider the subject of the use of guns by recidivists. *Id.*

To establish the constitutionality of the construction it urges upon the Court, the Government relies upon such cases as Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). In each of these cases, however, the statutes were construed in such a manner as to apply only to individuals or enterprises engaging in activities interfering, however minimal-

ly, with interstate commerce. For example, in Katzenbach v. McClung, *supra,* the statute applied only to restaurants serving a substantial amount of food which moved in interstate commerce, or serving food to interstate travelers. In Heart of Atlanta, *supra,* the statute applied only to establishments refusing accommodations to interstate travelers and transient guests. In Maryland v. Wirtz, *supra,* the statute applied only to companies engaged in commerce or the production of goods for commerce. In Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) the statute applied only to growers of commodities whose goods moved in interstate commerce. In United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), upon which the Government also relies, the statute applied only to manufacturers of goods in interstate commerce. Furthermore, in each of the cases on which the majority relies, the Court found that Congress had probed the commerce clause bases of the statutes and made substantial findings. It was, therefore, ·possible for the Court to accord "significant weight" to the "capacity of Congress to amass the stuff of actual experience and cull conclusions from it." Leary v. United States, *supra,* 395 U.S. at 35, 89 S.Ct. at 1548. There being no meaningful legislative history in this case, it is impossible for us to do so.

On the slender basis of the legislative which avoids this constitutional infirmity, as well as impermissible harshness, United States v. Phelps, Crim. Nos. 14,465 and 14,468 (M.D.Tenn., Feb. 10, history of Section 1202(a) (1), this Court could do no more than speculate whether Congress found a "rational connection" between the possession of firearms by persons previously convicted of felonies, and an effect on interstate commerce. Such speculation falls far short of the "substantial assurance" required by *Leary.* Leary v. United States, *supra,* 395 U.S. at 52–54, 89 S.Ct. 1532.

The only interpretation of the statute 1970), and absurdity, United States v.

Bass, 434 F.2d 1296 (2d Cir., 1970), is that which requires that receipt and possession, as well as transportation, be shown, in each case, to have been "in commerce or affecting commerce." No such showing was made in the instant case.

I would reverse the judgment of conviction.