**Richard Francis HYLAND II, Plaintiff,**

**v.**

**Loretta FUKUDA, in her capacity as Chief, Recruitment and Examination Division, Department of Personnel Services, State of Hawaii, Defendant.**

**Civ. No. 74–212.**

United States District Court,
D. Hawaii.

Sept. 30, 1975.

Michael F. O'Connor, Honolulu, Hawaii, for plaintiff.

Ronald Y. Amemiya, Atty. Gen, Cedric Choi, Deputy Atty. Gen., State of Hawaii, for defendant.

## MEMORANDUM DECISION

DICK YIN WONG, District Judge.

*Statement of Case*

On August 30, 1974, plaintiff filed this action for damages and declaratory relief against several officials of the State of Hawaii based on alleged violations of his constitutionally-protected rights to due process and equal protection of the laws arising from the State's refusal to certify plaintiff as eligible for employment as an Adult Corrections Officer at the Hawaii State Prison. By a stipulation for dismissal of parties subsequently entered into by the parties,[1] the only defendant remaining in this action is Loretta Fukuda, in her capacity as Chief of the Recruitment and Examination Division of the State Department of Personnel Services. This court has jurisdiction over this action under 42 U.S.C. § 1983, 28 U.S.C. § 1343, and 28 U.S.C. § 2201.

On June 4, 1975, defendant filed a motion for summary judgment. After hearing brief argument at the June 20, 1975 hearing on this motion, this court requested counsel for both parties to submit further briefs on the applicability and scope of the federal gun laws in this case. Having received these supplemental memoranda, including that submitted by plaintiff individually on his own behalf, this court is now prepared to rule on defendant's motion for summary judgment.

---

1. Dismissed from this action were George Pai, individually and in his capacity as Attorney General, his successor Ronald Y. Amemiya, in his capacity as Attorney General, Lawrence Kumabe, individually and in his capacity as Deputy Attorney General, and Loretta Fukuda, indvidually.

The basic facts in this case are not disputed. On October 12, 1973, plaintiff filed with the Department of Personnel Services an application for employment as an Adult Corrections Officer II at the Hawaii State Prison. On the application plaintiff stated that he had been convicted of armed robbery in California resulting in a three-year prison term which he served from 1964 to 1967. He was discharged from parole in 1970. Plaintiff's application was accepted, and plaintiff was allowed to take the administered civil service examination. Defendant subsequently informed plaintiff by a letter dated November 14, 1973, that:

> While you qualified on the examination, we are suspending your eligibility for employment consideration until we receive from the Department of the Attorney General, a response to our request for a clarification of the State and Federal laws concerning possession and use of firearms by persons who are convicted for a felony. As soon as we receive the response, we will notify you as to whether you can be considered for employment.

In a letter dated April 12, 1974, the Attorney General's Office advised defendant that:

> [A] prison guard who receives a firearm that has previously travelled in commerce, and who is a person having a prior felony conviction involving use of a firearm must have received a governor's pardon with respect to that conviction before he can be considered for employment as a prison guard.

Plaintiff then received from defendant a letter dated April 16, 1974 which stated:

> On the basis of the opinion received from our Department of the Attorney General, we will continue the suspension of your eligibility for employment consideration as an Adult Corrections Officer and Investigator until we receive evidence of your pardon from the Governor of California.

The record indicates that plaintiff previously made an application for, but never received, a pardon from the Governor of California. Plaintiff's resume, nevertheless, reflects an impressive record of accomplishments in corrections and rehabilitation work since 1964.

The job description for an Adult Corrections Officer II indicates that plaintiff would have to carry firearms and ammunition during the regular course of his employment at the Hawaii State Prison. All such weapons are owned by the State and are never carried outside the prison except pursuant to official work responsibilities—e. g., escorting inmates on trips and other movements outside the prison grounds. For the purpose of this motion, this court accepts as true defendant's allegation that all of these weapons have been manufactured and shipped to Hawaii from the mainland United States.[2]

*Legal Issues*

Both parties agree that under Hawaii law—see H.R.S. Sections 134–7 and 134–11(3)[3]—plaintiff may lawfully possess firearms and ammunition in the regular

---

2. Affidavit of Fred Ragasa, Acting Correctional Care Administrator, Hawaii State Prison Branch, Corrections Division of the State Department of Social Services and Housing, and Horace Taylor McConnaughey, President and General Manager of Security Equipment Corporation.

3. H.R.S. Section 134–7(b) provides that "[n]o person who has been convicted in this State or elsewhere, of having committed or attempted a crime of violence . . . shall own, or have in his possession, or under his control any firearm or ammunition therefor."

However, H.R.S. Section 134–11(3) provides that Section 134–7(b) "shall not apply to persons employed by the State . . . whose duties require them to be armed, while the persons are in the performance of their respective duties, or while going to and from their respective places of duty."

course of his employment as an Adult Corrections Officer II. They disagree, however, as to (1) the applicability and scope of 18 U.S.C. § 922(h) and 18 U.S.C. App. § 1202(a); (2) whether these federal laws have superseded the specific Hawaii law which would permit plaintiff to carry a firearm as a prison guard; and (3) assuming the state law has been superseded, whether the Governor of Hawaii could grant a pardon that would qualify plaintiff for an exemption under the federal gun laws.

In moving for summary judgment, defendant argues that plaintiff is ineligible, as a conclusion of law, for consideration as a person qualified for the position of Adult Corrections Officer II because his handling of firearms would violate 18 U.S.C. § 922(h) and 18 U.S.C. App. § 1202(a). Section 922(h)(1) states:

> It is unlawful for any person who . . . has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

■ From the legislative history, it appears clear that Congress' principal purpose in enacting Title IV of the Gun Control Act of 1968, 18 U.S.C. § 921 et seq., was to restrict public access to firearms as a means to curb crime by regulating all businesses engaged in importing, dealing, and manufacturing firearms. *Huddleston v. United States*, 415 U.S. 814, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974); *United States v. Petrucci*, 486 F.2d 329 (9th Cir. 1973). Plaintiff's receipt of a firearm from the State in the course of his employment does not appear to be the kind of business transaction which Congress sought to regulate under Section 922(h)(1). This view is supported by the Supreme Court's decision in *United States v. Bass*, 404 U.S. 336, 342-3, 92 S.Ct. 515, 520, 30 L.Ed.2d 488

(1971), where the Court noted that "Title IV apparently does *not reach possessions or intrastate transactions at all, even those with an interstate nexus*, but is *limited* to the *sending or receiving firearms as part of an interstate transportation*."[4] (Emphasis added.) In addition, 18 U.S.C. § 925(a)(1) specifically provides that the provisions of Title IV:

> shall not apply with respect to the transportation, shipment, receipt, or importation of any firearm or ammunition imported for, sold or shipped to, or *issued for the use of* . . . any State or any department, agency, or political subdivision thereof. (Emphasis added.)

Given these factors, this court concludes that Section 922(h)(1) would not prevent plaintiff from carrying a firearm as an Adult Corrections Officer II.

This court now turns to the more serious questions surrounding Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. App. § 1201 *et seq.* Section 1202(a)(1) reads, in pertinent part:

> Any person who has been convicted by a court of . . . a State or any political subdivision thereof of a felony . . . and who receives, possesses, or transports in commerce or affecting commerce . . . any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

Section 1202(a)(2) defines a felony as any offense punishable for a term exceeding one year. Section 1203 goes on to provide statutory exemptions for:

(1) any prisoner who by reason of duties connected with law enforcement has expressly been entrusted with a firearm by competent authority of the prison; and

(2) any person who has been pardoned by the President of the United States or the chief executive of a

4. See footnote 10 in *Bass, supra* at 343, 92 S.Ct. 515 for the Court's elaboration of this interpretation of the limited scope of Section 922(h) based on its previous decision in *Tot v. United States*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943).

State and has expressly been authorized by the President or such chief executive, as the case be, to receive, possess, or transport in commerce a firearm.

■ On their face, none of these exemptions are applicable to plaintiff and it would thus apear that plaintiff would be in violation of Section 1202(a)(1) in the instant case. This court, however, is mindful of the cardinal rule of statutory construction that a statute must be construed, if possible, so as to give effect to the intent of Congress. *Stevens v. United States*, 440 F.2d 144, 146 (6th Cir. 1971).

The legislative history [5] reveals that the Omnibus Crime Control and Safe Streets Act of 1968 was originally conceived as a measure to aid state and local law enforcement bodies through financial and administrative assistance. It was later amended to include much debated provisions regarding the admissibility of confessions and wiretapping. Title VII was an amendment that Senator Russell Long introduced at the last moment on the floor of the Senate. There was only brief debate on the amendment, and it was expected that a conference committee would give "further thought" and "study" to Title VII as originally drafted. However, Title VII passed both houses without modification. The chronology of events confirms the Supreme Court's characterization of the amendment as one that was "hastily passed, with little discussion, no hearings and no report." *United States v. Bass, supra* 404 U.S. at 344, 92 S.Ct. at 520.

Since no Congressional committee studied Title VII prior to its enactment, the entire legislative history of the statute is contained in the pages of the *Congressional Record*. In introducing Title VII on May 17, 1968, Senator Long explained his position on gun control as follows:

\* \* \* While we may be willing for a citizen to have a gun for the defense of his home—and I certainly have no objection to it—*we do not want the murderers, the burglars, the rapists, the looters, or the arsonists armed to the teeth and walking the streets. We do not want the habitual criminals who have committed all sorts of crimes armed and presenting a hazard to law-abiding citizens.*

\* \* \* \* \* \*

I have prepared an amendment which I will offer at an appropriate time. \* \* \*

It might be well to analyze, for a moment, the logic involved. When a man has been convicted of a felony, unless—as this bill sets forth—he has been expressly pardoned by the President and the pardon states that the person is to be permitted to possess firearms in the future, that man would have no right to possess firearms. He would be punished criminally if he is found in possession of them. (Emphasis added.) [6]

About one week later, on May 23, 1968, the day Title VII was agreed to by the Senate, Senator Long again explained:

Of all the gun bills that have been suggested, debated, discussed and considered, none except this Title VII attempts to bar possession of a firearm from persons whose prior behaviors have established their violent tendencies. In large part, Title VII is based on the legal theory that every dog is entitled to one bite. If one owns a dog and it attacks his neighbor, the owner is not liable if he did not know that his dog was dangerous. But

---

5. For a good discussion of the legislative history of Title VII, as well as a compilation of the relevant extracts from the *Congressional Record* on this measure, *see Stevens v. United States*, 440 F.2d 144 (6th Cir. 1971). *See also United States v. Bass, supra*, 404 U.S. at 344, n.11, 92 S.Ct. 515.

6. The page references to the *Congressional Record* have been taken from the Appendix attached to the *Stevens* case. 440 F.2d at 155.

if the dog thereafter attacks a second neighbor, the owner is liable because he has been placed on notice that his dog is dangerous.

So, under Title VII, every citizen could possess a gun until the commission of his first felony. Upon his conviction, however, Title VII would deny every assassin, murderer, thief and burglar of the right to possess a firearm in the future except where he has been pardoned by the President or a State Governor and has been expressly authorized by his pardon to possess a firearm.[7]

\* \* \* \* \* \*

State gun control laws where they exist have proven inadequate to bar possession of firearms from those most likely to use them for unlawful purposes. They did not stop Lee Harvey Oswald. They did not stop Eric Starvo Galt—or James Earl Ray.

\* \* \* \* \* \*

*Title VII would not substitute Federal control of possession of firearms for State control. It denies the States nothing in the exercise of their police powers. It supplements the State law and buttresses it.*

Nor would Title VII impinge upon the rights of citizens generally to possess firearms for legitimate and lawful purposes. *It deals solely with those who have demonstrated that they cannot be trusted to possess a firearm*— those whose prior acts—most voluntary —have placed them outside of our society. Their very acts show that society must be protected from them. They have no right, constitutional or otherwise, to prey upon and menace our leaders, or our citizens who are pursuing their own constitutional rights. Nor are they privileged to threaten or otherwise affect our commerce.

Despite all that has been said about the need for controlling firearms in this Country, no other amendment

heretofore offered would get at the Oswalds or the Galts. They are the types of people at which Title VII is aimed. (Emphasis added.) [8]

During the House's consideration of the entire Omnibus Crime Control bill, Congressman Pollock explained the purpose of Title VII as follows:

The overall thrust is to prohibit possession of firearms by criminals or other persons who have specific records or characteristics which raise serious doubts as to their probable use of firearms in a lawful manner.[9]

■ The legislative history is noticeably silent on the origin and purpose of the Section 1203(1) exemption for prisoners specially entrusted with the possession of firearms by prison authorities. As applied to the facts in this case, this court finds that the legislative history of Title VII "hardly speaks with that clarity of purpose which Congress supposedly furnishes courts in order to enable them to enforce its true will." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 483, 71 S.Ct. 456, 462, 95 L.Ed. 456 (1951); *United States v. Bass, supra* 404 U.S. at 346, 92 S.Ct. 515. Nevertheless, from the legislative history this court believes two conclusions are inescapable:

(1) That Section 1202 was intended to help control the rash of assaults on the lives of our political leaders and public figures by convicted felons and others listed in the section; and

(2) That Section 1202(a)(1) was more specifically intended to help state and local law enforcement bodies in their fight against violent street crimes by taking away from convicted felons and others who have shown they cannot be trusted their right as private citizens to possess firearms anywhere—on the streets or even in their own own homes.

7. *Id.* at 161.

8. *Id.* at 162.

9. *Id.* at 166.

This court, however, finds nothing in the legislative history indicating any specific Congressional intent to preclude state and local government officials from entrusting firearms to convicted felons hired to do either law enforcement or corrections work. Indeed, Section 1203 (1) negates any finding of a Congressional intent to apply a blanket rule prohibiting all convicted felons who have not been pardoned from possessing firearms under all circumstances.

In assessing the significance of Section 1203(2), this court believes that Congress considered a pardon as certification of a convicted felon's complete rehabilitation based on an implicit assumption that a pardon would only be granted only after a convicted felon's trustworthiness had been duly investigated. In this case, as in both of the situations contemplated in Section 1203, it may be presumed that the State would not hire plaintiff to this position of trust in corrections work without making such a thorough investigation. As indicated below, even if plaintiff must be deemed "eligible" under the State's civil service laws, nothing automatically would obligate the State to hire plaintiff as a prison guard.

In this court's view this judicially carved exception to Section 1202(a)(1) fully comports with Congress' stated concern for preventing convicted felons who have shown they cannot be trusted from walking the streets armed and presenting a hazard to law-abiding citizens, as well as the legislative intent manifested in Section 1203(1) on its face. Plaintiff's employment status would not automatically enable him to possess and use firearms just as any private citizen. His possession and use of firearms would be limited to the performance of his duties and responsibilities at or outside the prison. Plaintiff himself has described the absurdity of not finding this judicial exception to Section 1202(a) in these terms:

[I]t defies sensibility that Congress intended it to be permissible for an armed robber who is still serving his prison term to be able to carry a weapon to further prison interests (as permitted by 1203(1)) but the minute he is discharged and employed as a correctional officer *and does the same thing,* he is in violation of the law.[10]

■ Turning to the supremacy clause issue for the moment, this court feels that in seeking to aid state and local law enforcement officials with the enactment of Title VII, Congress did not intend to supersede such state laws as H.R.S. Section 134–11(3). Where no such state law existed, Congress perhaps intended that a widespread blanket rule, as set forth in Section 1202(a), should apply. However, where a state, pursuant to its police powers, had enacted legislation expressly permitting possession of firearms by convicted felons under very limited circumstances, Congress did not intend to nullify the effect of such legislation except in the case of an irreconcilable conflict between the federal and state law. As Senator Long explained, Title VII was intended to supplement and buttress the state law, and not to substitute the federal control over possession of firearms for state control.[11] Here the federal legislative intent to repeal the state law is not "clear and manifest," and both the federal and the state statutes are capable of co-existence. *Cf. United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

■ Based on the above interpretation of 18 U.S.C. § 922(h) and 18 U.S.C.App. § 1202(a), this court finds it unnecessary to delve into the quagmire of Tenth Amendment problems that would arise from federal control over the State in the use of firearms by state law enforcement and corrections officers on state property. For similar reasons this court expresses no view on the issue of whether the Governor of Hawaii may give a par-

10. Plaintiff's Supplemental Memorandum in Opposition to Motion for Summary Judgment at 16.

11. 440 F.2d at 162.

don that would qualify plaintiff for an exemption under Section 1203(2). But having found that defendant erred in concluding that the federal gun laws would prevent the State from hiring plaintiff as an Adult Corrections Officer II, this court believes a preliminary analysis and comments upon the effect of this erroneous conclusion on plaintiff's constitutional claims arising under 42 U.S.C. § 1983 are now in order.

*Procedural Due Process Rights*

■ In considering plaintiff's procedural due process claim, this court first notes that the scope of liberty and property interests protected under the Fourteenth Amendment is not infinite, and that the test of whether due process rights apply focuses on the *nature* of the interest, and not the severity of the detriment involved. *Board of Regents v. Roth,* 408 U.S. 564, 569–71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).[12] From plaintiff's complaint it is not clear whether plaintiff is claiming that defendant's action in suspending plaintiff's eligibility deprived him of only property rights or his liberty as well.

This is not a case, however, where the government's action has operated to injure plaintiff's good name, reputation, honor, or integrity. *Cf. Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). Taking plaintiff's alleged facts in their best light, there is no suggestion that the State's action imposed on plaintiff a "stigma" or other disability that foreclosed his freedom to take advantage of other employment opportunities. *Cafeteria Workers v. McElroy,* 367 U.S. 886, 898–99, 81 S.Ct. 1743, 6 L.Ed.2d 1230

(1961). The State, moreover, has not invoked any regulations to bar plaintiff from consideration for any other form of public employment. Therefore, it stretches the concept too far to say that plaintiff has been deprived of his "liberty" when he is deemed ineligible for consideration or is not hired in one job but remains as free as before to seek another job. *Roth,*[13] *supra* 408 U.S. at 573–75, 92 S.Ct. 2701; *Cafeteria Workers, supra* 367 U.S. at 895–96, 81 S.Ct. 1743.[14]

■ According to *Roth,* to have a property interest protected under the Fourteenth Amendment a person must (1) have a legitimate claim of entitlement to it; (2) have more than an abstract need or desire for it; and (3) have more than a unilateral expectation of it. Such property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* 408 U.S. at 577, 92 S.Ct. at 2709.

In this case, plaintiff's claimed right to public employment rests primarily upon the Hawaii Civil Service Laws, H.R.S. Chapter 76. Section 76–1 states, in pertinent part:

[I]t is the declared policy of the State that the personnel system hereby established be applied and administered in accordance with the following merit principles:

(1) Equal opportunity for all regardless of race, sex, age, religion, color, ancestry, or politics. * *

---

12. Under the *Roth* analysis, the importance of the interests or the severity of the detriment involved is to be considered in the weighing process for determining the *form* of the hearing required in each case by procedural due process. *Roth, supra,* 408 U.S. at 570, 92 S.Ct. 2701; *see Boddie v. Conn.,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Goldberg v. Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Hannah v. Larche,* 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).

13. Under *Roth* it is clear that the characterization of public employment in general as a privilege is no longer valid, given the Court's rejection of the wooden distinction between "rights" and "privileges" that once seemed to govern the applicability of due process rights. *Id.* 408 U.S. at 571 n. 9, 92 S.Ct. 2701.

14. For a contrary view, see Justice Marshall's dissenting opinion in *Roth, supra* at 588–89, 92 S.Ct. 2701.

(2) Impartial selection of the ablest person for government service by means of competitive tests which are fair, objective, and practical.

This section was recently supplemented by Act 205, enacted by the Hawaii State Legislature in 1974.[15] Section 1 of the Act states:

The purpose of this Act is to encourage and contribute to the rehabilitation of convicted persons and to assist those persons in their assumption of the responsibilities of citizenship. To this end, the legislature finds it a well-established principle of American jurisprudence that an occupation and equal access thereto is "property" within the meaning of Article I, section 4, of the Hawaii Constitution, which guarantees that, "No person shall be deprived of life, liberty or property without due process of law . . . ."

Section 2 created H.R.S. Section 731–3.1, which provides:

(a) A person shall not be disqualified from employment by the State or any of its political subdivisions or agencies . . . solely by reason of a prior conviction of a crime.

This court believes the cumulative effect of these sections is to confer upon plaintiff a "property right" with respect to his "eligibility" for public employment. This protected property interest is to be distinguished, however, from plaintiff's entitlement to the position of Adult Corrections Officer II. Plaintiff has no guarantee under the civil service laws that he will be hired because of defendant's acceptance of his job application and his high performance on the open competitive examination.[16] Therefore, under the *Roth* test, plaintiff can show nothing more than a unilateral expectation or belief that he should be hired after he has been certified as being eligible.

From the record, it appears that defendant acted in good faith in seeking clarification of the federal and state gun laws from the State Attorney General's Office. However, in taking away plaintiff's "eligibility" based on an erroneous interpretation of the law, defendant deprived plaintiff of other procedural rights guaranteed under Hawaii law to enable him to demonstrate his rehabilitation and fitness for public employment. H.R.S. Section 731–3.1 provides that:

[T]he State or any of its political subdivisions or agencies may consider as a possible justification for the refusal . . . of any employment . . . any conviction of a penal offense when such offense directly relates (i) to the applicant's possible performance on the job applied for . . .

For the purpose of this subsection, such refusal, . . . may occur only when the agency determines, after investigation in accordance with chapter 91, that the person so convicted has not been sufficiently rehabilitated to warrant the public trust; provided that discharge from probation or parole supervision, or a period of two years after final discharge or release from any term of imprisonment, without subsequent criminal conviction, shall be deemed rebuttable prima facie evidence of sufficient rehabilitation.

In finding that plaintiff's procedural due process rights were violated, this court emphasizes that even though a person has no right to a valuable governmental benefit such as public employment and the government may deny him that benefit for any number of reasons, there are some reasons upon which the government may not rely. *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

---

15. *See* Session Laws of Hawaii, Act 205, Section 5 (1974).

16. *See* H.R.S. Section 76–23 regarding the filling of vacancies and new positions.

*Equal Protection*

 The severity of plaintiff's detriment, here plaintiff's alleged financial losses and emotional distress, caused by defendant's action in treating plaintiff's application for the Adult Corrections Officer II position differently because of his convicted felon status, provides no key to whether the interest infringed is "fundamental" for equal protection purposes. *Dorrough v. Estelle,* 497 F.2d 1007, 1011 (5th Cir. 1974). Although the right to seek employment is vital to persons for supporting themselves and their families and for maintaining their self-respect and esteem, this court finds no supporting precedent for holding that the right to public employment is a fundamental right which would require this court to invoke the compelling state interest test. *Butts v. Nichols,* 381 F.Supp. 573, 579 (S.D.Iowa 1974). Furthermore, the courts have long held that a classification based on criminal record is not a suspect classification. *See, e. g., Hunter v. Erickson,* 393 U.S. 385, 392, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); *Korematsu v. United States* 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *Upshaw v. McNamara,* 435 F.2d 1188 (1st Cir. 1970); *Butts v. Nichols, supra.* Therefore, this court must analyze plaintiff's claim of denial of equal protection based on his status as a convicted felon in the light of the rational basis test.

 Under the rational basis test, an individual's rights will not be found to have been violated where the government's classification is reasonable, is not arbitrary, and rests upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. *F. S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

 Unlike the *Butts* case, plaintiff has not been subjected to a blanket prohibition against his employment by the State because of his criminal record. The statutory scheme established by H.R.S. Section 731–3.1 (relating to the use of conviction records and the procedural rights of applicants for showing rehabilitation and fitness for public employment) offers a fair and reasonable means for considering plaintiff's qualifications for the position applied for. Therefore, this statutory scheme suffers from no constitutional infirmity on its face. Plaintiff himself has not directly challenged the constitutionality of this statuory scheme. However, in the instant case plaintiff was denied any opportunity to demonstrate his fitness for employment, as provided under the statutory scheme, by defendant's action in taking away his "eligibility" based on an erroneous interpretation of the federal gun laws. Although defendant may have acted in good faith in seeking an interpretation of these federal laws, defendant's misapplication of statutes to plaintiff's eligibility status denied plaintiff a valuable "property" right, as discussed in the previous section. If plaintiff is able to prove that defendant's action was not done in good faith, plaintiff would have a valid claim of discrimination and denial of the equal protection of the laws. *Cf. Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

In making this determination, this court reiterates that the State's refusal to hire plaintiff for this particular job after he has been declared eligible would be subject to a separate anaylsis. The validity of the State interests relevant to a decision whether plaintiff should be hired—*e. g.,* possible state tort liability—is presently not before this court; only the means of implementing the State's goals relating to the civil service laws and the rehabilitation of convicted persons are the proper subject of judicial evaluation at this time.

Defendant's Motion for Summary Judgment is hereby denied.